******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* VICTOR M. ALICEA
## (AC 40311)

Prescott, Bright and Eveleigh, Js.

*Syllabus*

Convicted of two counts of the crime of assault in the first degree and of being a persistent dangerous felony offender in connection with his conduct in slashing the victim with a razor blade, the defendant appealed to this court. The defendant had been charged with one count each of intentional assault in violation of statute (§ 53a-59 [a] [1]) and reckless assault in violation of § 53a-59 (a) (3). The victim had argued with the defendant at their place of employment, a restaurant. Some of the altercation was caught on the restaurant's video. The defendant called 911 after the victim ran from the restaurant and, about forty-five minutes later, gave a statement to the police about the incident. After the close of the state's evidence, the defendant moved for a judgment of acquittal, in which he alleged, inter alia, that he could not be guilty of both assault charges because he had engaged in one act against one victim, and each charge required a mutually exclusive state of mind. During argument on the motion, the prosecutor indicated that he did not think the defendant could be convicted of both charges. The trial court stated that the evidence reasonably would permit a finding of guilt on both counts and denied the motion for a judgment of acquittal. The defendant thereafter elected not to testify in his defense. On appeal to this court, the defendant claimed, inter alia, that the jury's guilty verdicts of both intentional and reckless assault were legally inconsistent, and that the trial court improperly excluded from evidence his statement to the police. *Held*:

1. The defendant could not prevail on his claim that the verdicts of guilty of both intentional and reckless assault were legally inconsistent; to find the defendant guilty under § 53a-59 (a) (3), the jury was required to find that he engaged in conduct that was reckless and that created a grave risk of death to the victim that resulted in serious physical injury, which was not inconsistent with the jury's finding under § 53a-59 (a) (1) that the defendant also intended to seriously injure the victim, and because a conviction of one offense did not require a finding that negated an essential element of the other offense, the offenses were not mutually exclusive and, therefore, not legally inconsistent.

2. This court found unavailing the defendant's claim that his right to due process was violated because he was unaware that he could be convicted of both assault charges; on the basis of the relevant charging document, the theory on which the case was tried and submitted to the jury, and the trial court's jury instructions regarding the assault charges, the defendant had notice, prior to when he had to decide whether to testify, that both assault charges were going to be presented to the jury separately and not in the alternative, and he was aware of the charges brought against him and how the court was going to instruct the jury regarding those charges, as neither the information nor the state's argument informed the jury that it should find the defendant guilty on only one of the charges, after the court informed counsel that a guilty verdict on both counts was permitted under the law, the state told the court and defense counsel that it would be arguing consistent with that message, at closing argument the prosecutor told the jury that the evidence demonstrated that the defendant acted intentionally or, at the very least, recklessly, and did not tell the jury that it could or should find guilt only as to one of the those charges, and the court's instructions to the jury were not based on alternative charges.

3. The trial court did not abuse its discretion by excluding from evidence the defendant's statement to the police, which the defendant claimed was admissible under the spontaneous utterance exception to the rule against hearsay; the defendant did not meet his burden of proving that he did not have an opportunity to think about and fabricate or embellish his story, as he did not begin his statement to the police until approximately forty minutes after the end of his 911 call, which lasted less than two minutes, and although the amount of time that passes between

an incident and the utterance of a statement is not dispositive of its spontaneity, nothing in the record demonstrated error in the trial court's determination that the defendant had time to fabricate and embellish his statement.

4. The evidence was sufficient to disprove beyond a reasonable doubt the defendant's claim of self-defense; the defendant's assertions that it was possible that his left hand circled the victim's head first as he cut the victim's throat and that the victim had thrown a left hook at the defendant before the slashing were unavailing, as the jury reasonable chose to credit the victim's testimony, which was consistent with the restaurant's video, that he did not strike the defendant, that he and the defendant were arguing, and that the defendant grabbed him and cut his throat.

Argued April 8—officially released July 30, 2019

*Procedural History*

Two part substitute information charging the defendant, in the first part, with two counts of the crime of assault in the first degree and, in the second part, with being a persistent dangerous felony offender, brought to the Superior Court in the judicial district of Windham, geographical area number eleven, where the first part of the information was tried to the jury before *Seeley, J.*; thereafter, the court denied the defendant's motions to dismiss and for a judgment of acquittal; verdict of guilty; subsequently, the defendant was presented to the court on a plea of nolo contendere to the second part of the information; judgment in accordance with the verdict and plea, from which the defendant appealed to this court. *Affirmed*.

*Jonathan R. Formichella*, certified legal intern, with whom was *James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Anne F. Mahoney*, state's attorney, and *Mark A. Stabile*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. The defendant, Victor M. Alicea, appeals, following a jury trial, from the judgment of conviction of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) (intentional assault) and assault in the first degree in violation of General Statutes § 53a-59 (a) (3) (reckless assault). The defendant, following a plea of nolo contendere to a part B information, also was convicted of being a persistent dangerous felony offender pursuant to General Statutes § 53a-40 (a) (1) (A). On appeal, the defendant claims that (1) the jury's verdicts of guilty on both intentional and reckless assault were legally inconsistent, (2) the court erred in excluding his statement to the police, given approximately forty-five minutes after the incident at issue, and (3) the state failed to disprove his claim of self-defense. We affirm the judgment of the trial court.

The following facts, as reasonably could have been found by the jury on the basis of the evidence, and procedural history assist in our consideration of the defendant's claims. The defendant and the victim, Tyrone Holmes, worked at Burger King in the Dayville section of Killingly (restaurant). Holmes generally worked third shift as a porter, doing maintenance and cleaning at the restaurant. On July 9, 2015, the defendant, who also worked as a porter at the restaurant, was covering Holmes' third shift. After midnight, Holmes, accompanied by his friend, Robert Falu, arrived at the closed restaurant to drop off some supplies and to speak with the defendant, whom, he had heard, had been talking about him. Falu waited in or around Holmes' vehicle while Holmes let himself into the back entrance using his key. Holmes then asked the defendant to step outside. The defendant and Holmes went outside, had a brief discussion, and the defendant denied having talked negatively about Holmes. Everything appeared fine to Holmes. Holmes returned to his vehicle, retrieved some supplies, and went back into the restaurant.

Upon returning to the restaurant, Holmes heard the defendant on his cell phone telling whomever was listening to get to the restaurant because the defendant had a problem. Holmes told the defendant that they did not have a problem, and the defendant walked away while Holmes was trying to talk to him. Holmes followed the defendant, who went near the fryers, and the defendant repeatedly told Holmes that he was trying to save Holmes' life. Holmes, who was holding a set of car keys in his hands, tossing them from one hand to the other, became angry and the two began arguing. The defendant then pulled Holmes' head toward him and cut his throat with a razor blade. Initially, Holmes thought the defendant had punched him, and he assumed a fighter's stance. He then saw that he was bleeding, however, and he ran from the restaurant. Some of the altercation

was caught on the restaurant's video. Once outside, Holmes threw his car keys to Falu and told him to start the car. The defendant, who had followed Holmes outside, chased him around the car twice, and said, "see what happens when you mess with me." Holmes got into the driver's seat of the car and drove away with Falu. After Holmes arrived home, Holmes' wife called 911, and she tried to stop the bleeding from Holmes' neck by applying pressure with a towel. The defendant also called 911 from the restaurant.

Holmes was taken by ambulance to Day Kimball Hospital in Putnam, where he was examined by Joel Bogner, an emergency medicine physician, who determined that Holmes had sustained a neck laceration that was approximately seven inches long and that the care he needed was "beyond the capabilities of Day Kimball Hospital . . . ." Holmes was given morphine sulfate for pain and then was transferred to Hartford Hospital, via ambulance, where he underwent surgery for the laceration to his neck, which included the repair of a lacerated neck muscle and his left external jugular vein.

The defendant was arrested and later charged with both intentional and reckless assault. The jury found the defendant guilty of both charges,[1] and, after accepting the verdict, the court rendered judgment of conviction on both counts. The defendant also pleaded nolo contendere to being a persistent dangerous felony offender. The court merged the conviction of the two robbery charges and sentenced the defendant to a mandatory minimum term of ten years of incarceration, followed by twelve years of special parole on the count of intentional assault as a persistent dangerous felony offender. This appeal followed.

I

A

The defendant first claims that the jury's verdicts of guilty of both intentional and reckless assault were legally inconsistent because each charge required a mutually exclusive state of mind. He contends that he cannot be guilty of both intentional and reckless assault because he engaged in but one single act, against one single victim. The defendant relies on *State* v. *Chyung*, 325 Conn. 236, 157 A.3d 628 (2017), and *State* v. *King*, 216 Conn. 585, 583 A.2d 896 (1990), to support his claim. The state responds that the verdicts were not legally inconsistent in this case because a person can act both recklessly and intentionally at the same time, as to different results, as was concluded by our Supreme Court in *State* v. *Nash*, 316 Conn. 651, 660–61, 114 A.3d 128 (2015). We agree with the state.

Section 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third

person by means of a deadly weapon or a dangerous instrument; or . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . .”

Pursuant to General Statutes § 53a-3 (11): “A person acts ‘intentionally’ with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . .”

Pursuant to § 53a-3 (13): “A person acts ‘recklessly’ with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . .”

“A claim of legally inconsistent convictions, also referred to as mutually exclusive convictions, arises when a conviction of one offense requires a finding that negates an essential element of another offense of which the defendant also has been convicted. . . . In response to such a claim, we look carefully to determine whether the existence of the essential elements for one offense negates the existence of [one or more] essential elements for another offense of which the defendant also stands convicted. If that is the case, the [convictions] are legally inconsistent and cannot withstand challenge. . . . Whether two convictions are mutually exclusive presents a question of law, over which our review is plenary.” (Citations omitted; internal quotation marks omitted.) *State* v. *Nash*, supra, 316 Conn. 659.

“[C]ourts reviewing a claim of legal inconsistency must closely examine the record to determine whether there is any plausible theory under which the jury reasonably could have found the defendant guilty of [more than one offense].” Id., 663. Nevertheless, the state is bound by the theory it presented to the jury. See *State* v. *Chyung*, supra, 325 Conn. 256 (where state argued defendant engaged in only one act, rather than two, principles of due process prohibited state on appeal from relying on theory that defendant engaged in two acts).

The defendant argues that *King* and *Chyung* are similar to the present case and that *Nash* is inapposite. We recently discussed the distinctions between those three cases in *State* v. *Daniels*, 191 Conn. App. 33, 43–48, A.3d      (2019).

In *Daniels*, we first discussed our Supreme Court’s explanation of *State* v. *King*, supra, 216 Conn. 585: “In *Nash*, our Supreme Court discussed *King* at length and

explained: In *King,* the defendant had 'claimed that his convictions of attempt to commit murder and reckless assault of the same victim based on the same conduct were legally inconsistent because they required mutually exclusive findings with respect to his mental state. . . . We agreed with this claim, explaining that King's conviction for attempt to commit murder required the jury to find that he acted with the *intent to cause the death of the victim,* whereas his conviction for reckless assault required the jury to find that he *acted recklessly and thereby created a risk that the victim would die.* . . . We further explained that the statutory definitions of intentionally and recklessly are mutually exclusive and inconsistent. . . . Reckless conduct is not intentional conduct because [a person] who acts recklessly does not have a conscious objective to cause a particular result. . . . Thus, we observed that [t]he *intent to cause death required for a conviction of attempted murder* [under General Statutes §§ 53a-49 and 53a-54a (a)] . . . necessitated a finding that the defendant *acted with the conscious objective to cause death . . .* [whereas] [t]he *reckless conduct necessary to be found for a conviction of assault* under [§ 53a-59 (a) (3)] . . . required a finding that *the defendant acted without such a conscious objective. . . .* We concluded, therefore, that the jury verdicts [with respect to attempt to commit murder and reckless assault in the first degree] each of which requires a mutually exclusive and inconsistent state of mind as an essential element for conviction cannot stand.' . . . *State* v. *Nash,* supra, 316 Conn. 660–61." (Emphasis in original.) *State* v. *Daniels,* supra, 191 Conn. App. 43–44.

We then discussed *State* v. *Chyung,* supra, 325 Conn. 236: "In *Chyung,* the jury found the defendant guilty of murder, in violation of § 53a-54a, and of reckless manslaughter in the first degree with a firearm, in violation of General Statutes §§ 53a-55a (a) and 53a-55 (a) (3), for the shooting death of his wife. . . . The court in *Chyung* found that the jury's guilty verdicts as to both charges were legally inconsistent because the defendant could not act both intentionally and recklessly with respect to the same victim, the same act, and the same result simultaneously. . . . Our Supreme Court explained that to find the defendant guilty of the crime of intentional murder, the jury was required to find that the defendant had the *specific intent to kill the victim,* his wife, but, to find the defendant guilty of reckless manslaughter, the jury was required to find that he acted recklessly, meaning, that he *acted without a conscious objective to cause the death of the victim,* but consciously disregarded the risk of his actions, thereby putting the life of the victim in grave danger. . . . The court concluded that a defendant cannot act with a *conscious disregard* that his actions will create *a grave risk of death* to another, while, at the same time, specifically *intending to kill* that person. . . .

The defendant cannot simultaneously act intentionally and recklessly with respect to the same act and the same result . . . .” (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Daniels*, supra, 191 Conn. App. 44–45.

Finally, we discussed our Supreme Court's decision in *State* v. *Nash*, supra, 316 Conn. 651, which we found controlling. See *State* v. *Daniels*, supra, 191 Conn. App. 45–48. As background, the defendant in *Nash* had become angry with the brother of the victim. *State* v. *Nash*, supra, 654–55. The defendant wanted to teach a lesson to the victim's brother, so he and a friend went to the home of the victim's brother, where he resided with his family, including the victim. Id. The defendant walked to the backyard of the victim's home and fired several gunshots into the second story of the home. Id., 655. At the time of the shooting, the victim and her sister were in a second floor bedroom. One of the bullets penetrated through the bedroom wall and struck the victim, who then was transported by ambulance to a hospital, where she was treated for a gunshot wound. Id.

We explained in *Daniels*: “In *Nash*, the jury found the defendant guilty of, among other things, both intentional and reckless assault in the first degree pursuant to . . . § 53a-59 (a) (1) and (a) (3), respectively, and the court rendered judgment in accordance with the jury's verdicts. . . . On appeal, the defendant claimed in part that the jury's verdicts of guilty on both intentional and reckless assault were legally inconsistent because each crime required a mutually exclusive state of mind. . . . Our Supreme Court disagreed, explaining that the two mental states required for intentional and reckless assault in the first degree *related to different results*. . . . More specifically, the court explained, ‘in order to find the defendant guilty of [*both* intentional and reckless assault in the first degree], the jury was required to find that *the defendant intended to injure another person and that, in doing so, he recklessly created a risk of that person's death*. In light of the state's theory of the case, there was nothing to preclude a finding that the defendant possessed both of these mental states with respect to the same victim at the same time by virtue of the same act or acts. In other words, the jury could have found that the defendant intended only to injure another person when he shot into [the victim's] bedroom but that, in doing so, he recklessly created a risk of that [victim's] death in light of the circumstances surrounding his firing of the gun into the dwelling. Accordingly, because the jury reasonably could have found that the defendant simultaneously possessed both mental states required to convict him of both intentional and reckless assault, he cannot prevail on his claim that the convictions were legally inconsistent’. . . . [*State* v. *Nash*, supra, 316 Conn.] 666–68.

"The court in *Nash* went on to examine and compare § 53a-59 (a) (1) and (a) (3): 'Intentional assault in the first degree in violation of § 53a-59 (a) (1) requires proof that the defendant (i) had the intent to cause serious physical injury to a person, (ii) caused serious physical injury to such person or to a third person, and (iii) caused such injury with a deadly weapon or dangerous instrument. Reckless assault in the first degree in violation of § 53a-59 (a) (3) requires proof that the defendant (i) acted under circumstances evincing an extreme indifference to human life, (ii) recklessly engaged in conduct that created a risk of death to another person, and (iii) caused serious physical injury to another person. As we previously explained, the mental state elements in the two provisions—"intent to cause serious physical injury" and "recklessly engag[ing] in conduct which creates a risk of death"—do not relate to the same result.[2] Moreover, under both provisions, the resulting serious physical injury is an element of the offenses that is separate and distinct from the mens rea requirements.' Id., 668–69. The court then held: 'Because the defendant's convictions for intentional and reckless assault in the first degree required the jury to find that the defendant acted intentionally and recklessly with respect to different results, the defendant cannot prevail on his claim that those convictions are mutually exclusive and, therefore, legally inconsistent.'[3] Id., 669.

"The court in *Nash* provided an example of where a single act, directed to a single victim, could result in a conviction of both intentional and reckless assault in the first degree. 'For example, if A shoots B in the arm intending only to injure B, A nevertheless may recklessly expose B to a risk of death if A's conduct also gave rise to an unreasonable risk that the bullet would strike B in the chest and thereby kill him. In such circumstances, a jury could find both that A intended to injure B and, in doing so, recklessly created an undue risk of B's death.' Id., 666 n.15." (Citations omitted; emphasis in original; footnotes altered.) *State* v. *Daniels*, supra, 191 Conn. App. 45–48.

In *Daniels*, we also explained: "We recognize that the differences between *King*, *Chyung*, and *Nash* are subtle. For example, in *King*, the jury necessarily would have to have found that the defendant acted with the specific intent to cause the death of the victim (attempted murder), and, at the same time, acted without the conscious objective to create a risk of death for the victim (reckless assault). See *State* v. *King*, supra, 216 Conn. 585. It is impossible to possess both mental states simultaneously.

"In *Chyung*, the jury necessarily would have to have found that the defendant had the specific intent to kill the victim (murder), and simultaneously, that the defendant acted without the conscious objective to create a

grave risk of death for the victim (reckless manslaughter). See *State* v. *Chyung*, supra, 325 Conn. 236. Again, it is impossible to have both intents simultaneously.

"In *Nash*, however, the jury would have to have found that the defendant intended to cause *serious physical injury* to the victim (intentional assault), and, at the same time, that the defendant acted without the conscious objective of creating a *grave risk of death* for the victim, resulting in the victim's serious physical injury (reckless assault). See *State* v. *Nash*, supra, 316 Conn. 666–67. Intentional assault requires a *specific intent to cause serious physical injury*; reckless assault requires *recklessly creating a grave risk of death*, which results in serious physical injury. One can intend to cause serious physical injury to a victim, while, at the same time, consciously disregarding the fact that he or she is putting that victim's life in grave danger, ultimately resulting in serious physical injury to the victim." (Emphasis in original.) *State* v. *Daniels*, supra, 191 Conn. App. 48 n.10.

Accordingly, to be guilty under § 53a-59 (a) (3), it was not enough for the defendant to have engaged in conduct that was reckless, resulting in serious physical injury to Holmes; rather, the jury was required to find that the defendant engaged in conduct that was reckless and that *created a grave risk of death to Holmes*, ultimately resulting in Holmes' serious physical injury. Such a conclusion is not inconsistent with the jury finding that the defendant also intended to seriously injure Holmes under § 53a-59 (a) (1). Put another way, because a conviction of one offense does not require a finding that negates an essential element of the other offense, they are not mutually exclusive, and therefore not legally inconsistent.

Although the defendant has presented a well argued, well briefed claim on this issue, we conclude that our Supreme Court's decision in *Nash* is controlling. Guided by that decision, as well as by our recent decision in *Daniels*, we conclude that the jury's verdicts of guilty of both intentional and reckless assault are not legally inconsistent.

B

As part of his inconsistent verdict claim, the defendant also argues that "[r]eversal is mandated in this case for a second reason." He contends that the state is bound by the theory it allegedly presented at trial, namely, that these charges were brought in the alternative. He states that the majority in *State* v. *Chyung*, supra, 325 Conn. 236, and the dissent in *State* v. *King*, 321 Conn. 135, 159–71, 136 A.3d 1210 (2016) (*King 2016*), mandate "that the state may not rely upon a theory establishing legal consistency of verdicts when it does not argue that theory to the jury." In his reply brief, he contends that his right to due process is impli-

cated and that he made the decision not to testify in this case only after the state set forth its position that these charges were in the alternative. But see id., 148 (due process analysis should not be blended with legal consistency of verdict analysis, and each should be evaluated independently of each other, as two separate claims). We conclude that the defendant's right to due process was not violated because he was aware of the charges brought against him and how the court was going to instruct the jury regarding those charges.

"A determination of whether a defendant has received constitutionally sufficient notice of the charges to be brought against him at trial is guided by the following framework. A fundamental tenet of our due process jurisprudence is that [i]t is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made. . . . [T]o uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused. . . . Reviewing courts, therefore, cannot affirm a criminal conviction based on a theory of guilt that was never presented to the jury in the underlying trial. . . .

"Principles of due process do not allow the state, on appeal, to rely on a theory of the case that was never presented at trial. . . . Although we recognize that the finder of fact may consider all of the evidence properly before it, in order for us to uphold the state's theory of the case on appeal, that theory must have been not merely before the jury due to an incidental reference, but as part of a coherent theory of guilt that, upon [review of] the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense. . . . Essentially, the state may not pursue one course of action at trial and later, on appeal, argue that a path [it] rejected should now be open to [it] . . . . To rule otherwise would permit trial by ambuscade. . . . Accordingly, on appeal, the state may not construe evidence adduced at trial to support an entirely different theory of guilt than the one that the state argued at trial." (Citations omitted; internal quotation marks omitted.) Id., 148–49.

Our Supreme Court in *King 2016* instructed: "Whether a defendant has received constitutionally sufficient notice of the charges of which he was convicted may be determined by a review of the relevant charging document, the theory on which the case was tried and submitted to the jury, and the trial court's jury instructions regarding the charges." (Internal quotation marks omitted.) Id., 149–50.

In the present case, the information set forth two

independent charges, intentional and reckless assault, with no indication whatsoever that the charges were being brought in the alternative. After reviewing the information and the transcripts of the trial, we are not persuaded that the state tried the case or presented its evidence in a manner that indicated that it was proceeding on the theory that the charges against the defendant were in the alternative. We acknowledge that the prosecutor, during argument on the defendant's oral motion for a judgment of acquittal, which, in part, was brought on the ground that the charges were mutually exclusive, held outside of the presence of the jury and after the close of the state's evidence, indicated to the defendant and the court that he did not think that the defendant could be convicted of both charges. The trial court, however, citing *Nash*, immediately sought to clarify the prosecutor's statement. The court stated that it could consider charging these counts in the alternative by telling the jury that if it finds the defendant guilty on count one, then it should find him not guilty on count two, but that it thought, "under *Nash*, both do go to the jury; if the jury comes back guilty on both, then, at sentencing it becomes a question of either . . . merger or vacating." The prosecutor responded that he understood and that he had put his stance "in [a] more stark position than [he] actually [would] when [he] stand[s] in front of the jury, but that's going to be sort of the message that [he would be] conveying." The court then denied the defendant's motion for a judgment of acquittal, stating in relevant part that, "taking [the] evidence in the light most favorable to the state, the evidence reasonably would permit a finding of guilty for both count one and count two." Thus, contrary to his position on appeal, the defendant had notice, prior to the point in time when he had to make the decision to testify, that both charges of the information were going to be presented to the jury separately and not in the alternative.

The next day, the defendant informed the court that he would not testify in his defense. At that time, the court also raised the defendant's motion for a judgment of acquittal again, and it restated, specifically for the record, the discussion of the previous day and the holding in the *Nash* case. The court then stated that the parties had engaged in several charging conferences and that the court previously had handed out preliminary jury instructions, and it indicated that the defense had submitted a request to charge on self-defense. The court also stated for the record that it had e-mailed counsel the revised jury charge the previous evening and that counsel had met that morning to put in the final touches, after conducting a page by page review. Defense counsel stated that he was "satisfied that the language that the court intend[ed] to instruct the jury with [was] appropriate."

The prosecutor, during closing argument, went over

the elements of each count separately, and, during his argument as to the elements of the second count, told the jury that he believed that the evidence demonstrated that the defendant's conduct was intentional, and that, if the jury "[d]id not agree with that," then, "at the very least," the jury could conclude that the defendant "acted recklessly." The prosecutor continued his argument on the elements of the second count and, thereafter, stated, "once again, if you do not agree, then I believe that, at the least, you can conclude that [the defendant] simply didn't care if [Holmes] lived or died based on his action, the slitting of the throat . . . ." Defense counsel's closing argument centered on the defendant's claim of self-defense. During rebuttal, the prosecutor argued that the state's evidence demonstrated that the defendant did not act in self-defense. The court charged the jury on both counts and on the defendant's claim of self-defense. Consistent with *Nash*, the court did not tell the jury that the charges were in the alternative. Rather, the court told the jury to consider each count separately, along with its separate consideration of whether the state disproved the defendant's self-defense claim on each count. On appeal, the defendant does not claim error in the charge.

The defendant relies on *Chyung* and the dissent in *King 2016* to support his claim that his right to due process was violated because he was unaware that he could be found guilty of both counts. In *Chyung*, the verdicts were inconsistent because the state had proceeded at trial on a one act, one result, one victim theory for the charges of intentional murder and reckless manslaughter. *State* v. *Chyung*, supra, 325 Conn. 239–40; see also part I A of this opinion. Our Supreme Court explained that these two charges, when tried on such a theory, involve mutually exclusive states of mind, which a defendant cannot possess simultaneously. Id., 247–48. The state, on appeal, argued, in part, that the conviction could be upheld on the alternative ground that the jury could have found that the defendant did not act both intentionally and recklessly with regard to the same act and the same result, but that he engaged in two separate acts, one reckless and one intentional, with two separate results. Id., 254–55. Our Supreme Court rejected the state's argument on due process grounds because the state had not presented that theory to the jury, but, instead, had proceeded only on a one act, one result, one victim theory throughout the trial. Id., 255–56.

In *King 2016*, the defendant was convicted of intentional assault in the first degree and reckless assault in the first degree. *King 2016*, supra, 321 Conn. 137. On appeal to the Appellate Court, the defendant had argued that the verdicts were legally inconsistent and that the state had tried the case on a one act, one result, one victim theory; the Appellate Court agreed. See *State* v. *King*, 149 Conn. App. 361, 362–63, 87 A.3d 1193 (2014),

rev'd, 321 Conn. 135, 136 A.3d 1210 (2016). Following the granting of certification to appeal, our Supreme Court concluded that the verdicts were not legally inconsistent because the evidence permitted the jury to conclude that there were two acts, not one, each with a different mental state; *King 2016*, supra, 144; and because the conviction, pursuant to *Nash*, was not legally inconsistent as a matter of law in that the two mental states related to different results. Id., 142, 144–45.

Our Supreme Court explained in *King 2016* that the issue of whether the verdicts were legally inconsistent and whether the defendant's right to due process was violated by the state's attempt to change its theory of the case are separate issues. Id., 148. On the issue of whether the defendant's right to due process had been violated because the state had prosecuted him on a theory that each crime had been charged in the alternative and he was unaware that he could be convicted of both, our Supreme Court held that the defendant had sufficient notice of the charges against him. Id., 150. The court explained that the state did not present the evidence in a manner that related specifically to one charge or the other charge; id., 146; the trial court told the defendant that he could be convicted of both charges; id.; the defendant was charged in the information with *both* intentional and reckless assault; id., 139; and the trial court, in its instructions, told the jury to reach a verdict on both charges. Id., 154. The court also pointed out that the state's closing argument to the jury was ambiguous on whether it was seeking a conviction on only one of the charges, rather than on both. Id., 155–56.

The dissent in *King 2016*, on which the defendant relies, expressed disagreement with the majority on the issue of whether the state in closing argument expressed to the jury that its theory of the case was that the defendant was guilty of *either* intentional or reckless assault. Id., 171 (*Robinson, J.*, dissenting). The dissent in *King 2016*, however, offers the defendant no assistance in this case; it is the *dissenting* opinion. The majority in *King 2016* disagreed with the dissent's approach to its analysis because the dissent "relie[d] solely on the prosecutor's statement during closing argument to the exclusion of the contents of the substitute information and the jury instructions"; id., 157 n.13; and the majority, although concluding that the state's closing argument was ambiguous, held that "when viewed in the context of the substitute information, the state's evidence at trial, and the jury instructions, the defendant had sufficient notice that he could be convicted of both reckless and intentional assault. Accordingly, the manner in which the defendant was convicted satisfies the requirements of due process." Id., 157–58.

In the present case, reviewing "the relevant charging

document, the theory on which the case was tried and submitted to the jury, and the trial court's jury instructions regarding the charges''; (internal quotation marks omitted) id., 149–50; we conclude that the defendant's right to due process was not violated; he had sufficient notice of the charges against him. On the basis of our review of the transcripts, we are not persuaded that the state proceeded on a theory that the charges were in the alternative, and, furthermore, neither the information nor the state's argument informed the jury that it should find the defendant guilty on only one of the charges. Additionally, although the state indicated to the court during argument on the defendant's oral motion for a judgment of acquittal, outside of the presence of the jury, that it would argue those charges to the jury in the alternative, the court immediately told both attorneys that *Nash* permitted a guilty verdict on both counts because they were not inconsistent, and the state then corrected itself and told the court and defense counsel that it would be arguing consistent with that message. Thus, when he made his decision not to testify, the defendant knew that the court was going to submit both charges to the jury and that he could be found guilty of both charges. At closing argument, the prosecutor told the jury that the evidence demonstrated that the defendant acted intentionally, but, at the very least, he acted recklessly, without concern for the life of Holmes. The prosecutor did not tell the jury that it could or should find guilt only as to one of the charges. Finally, the court's instructions to the jury were not based on alternative charges, and the defendant was well aware of the court's intent not to charge the jury in the alternative before he chose not to testify. The court clearly told the jury to consider each charge and defense separately. After reviewing the record in this case, and after considering the relevant case law, we conclude that the facts of this case are not substantively different from those in *King 2016*. Applying the holding in that case, as we must, we conclude that the defendant's right to due process was not violated.

## II

The defendant also claims that the court erred in excluding his statement to the police, given approximately forty-five minutes after the incident at issue. He contends that the statement was admissible as a spontaneous utterance,[4] and that it was critical to his self-defense claim because it demonstrated that he thought Holmes was hostile and threatening. We are not persuaded.[5]

The following additional facts inform our review. Approximately forty-five minutes after the incident, the defendant gave a statement to the police. In that statement, he told the police, in relevant part: "Some time after 12:30 a.m., [Holmes] came inside into the kitchen

through the rear door. I said, 'hey, how you doing?' He told me to come outside but didn't tell me why. I followed him outside. I put a broom by the door to keep it from locking behind me. Once outside, [Holmes] told me that he heard I was talking shit about him. I asked him who told him that. He told me not to worry about it. I told him to bring the person here so I could smack him for lying. He told me he couldn't do that because it was [one] of his people. I told him I didn't care and that I don't talk about him or anybody else. [Holmes] had brought another male friend with him who was also outside at the time.

"He started to get hostile and told me that he wasn't from here and he represents Bloods. I had my spray bottle of [degreaser] with me so I went inside [to] put it away. [Holmes] followed me inside and he kept yelling and accusing me. I raised [my] hands up in front of me telling him to leave me alone. I was holding my hands open and not in a fighting stance. I did have a razor blade in my hands still which I use for scraping the fryers in the [restaurant]. I told him, 'listen, I'm trying to save your life.' I told him that because I suffer from bi-polar disease and I know I can get violent when I feel threatened. He then got into a fighting stance with his hands clenched in a fist. [Holmes] is a big guy and I knew that if he hit me I'd be out for the count. I then lashed out at him with my right hand. I had the razor blade in my hand. I cut him on the left side of his neck. [Holmes] ran out yelling 'the mother fucker cut me!' [Holmes] then got in the driver side of the car and the other male got in the passenger side. [Holmes] said he was going to call the cops. I told him I would call them for him because he came to [the restaurant] when he wasn't supposed to be there. I then called 911 to report [the] incident. In the process of the altercation, I also cut my right hand on the middle finger."

During trial, the defendant offered this statement into evidence on the grounds that two hearsay exceptions applied, namely, as a spontaneous utterance and as a statement of mental/emotional condition. The court held that the spontaneous utterance exception did not apply because the defendant had time to embellish and fabricate in his statement. The court also held that the mental state exception did not apply. On appeal, the defendant claims that the court erred in failing to admit the statement as a spontaneous utterance. See also footnote 4 of this opinion.

"The [spontaneous] utterance exception is well established. Hearsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation

and fabrication by the declarant." *State* v. *Kelly*, 256 Conn. 23, 41–42, 770 A.2d 908 (2001).

"The ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation. . . . While the amount of time that passes between a startling occurrence and a statement in question is not dispositive, the court is entitled to take all the factual circumstances into account when deciding the preliminary question of whether a statement was spontaneous. . . . The appropriate question is whether the statements were made before reasoned reflection had taken place." (Citations omitted; internal quotation marks omitted.) Id., 60–61.

The defendant contends that he established the admissibility of his statement by meeting the four part test for admissibility. See id., 41–42. He argues in relevant part: "The trial court's conclusion that the defendant had time to fabricate information contained in the voluntary statement was erroneous. The defendant did not have time to fabricate or embellish after the altercation. . . . [T]he defendant's statement was made only forty-five minutes after the altercation. This was not enough time to fabricate critical facts that would lead to his acquittal, particularly as he was occupied with the 911 call during a substantial [portion] of that time." He also argues that the statement "is corroborated by the surveillance footage," thereby demonstrating its reliability. The state contends that the court's exclusion of the statement was not an abuse of discretion. We agree with the state.

The record reveals that the defendant called 911 within minutes of the altercation, at 12:48 a.m. Contrary to the defendant's argument that the 911 call took up "a substantial [portion]" of the time between the incident and his statement to the police, the defendant's phone call to 911 lasted less than two minutes. The defendant did not begin his statement to the police until 1:30 a.m., approximately forty minutes after his 911 call ended. Although we are mindful that the amount of time that passes between an incident and the utterance of a statement is not dispositive of its spontaneity, the trial court in the present case determined that the defendant had time to fabricate and embellish his statement. There is nothing in the record that demonstrates error in that finding. Accordingly, the defendant has not met his burden of proving that he did not have an opportunity to think about and fabricate or embellish his story. The court did not abuse its discretion in excluding the statement. See *State* v. *Kelly*, supra, 256 Conn. 61 (defendant failed in burden of proving court abused discretion in concluding that one and one-half hour time frame between incident and utterance was enough time to fabricate story).

## III

The defendant also claims that the state failed to disprove his claim of self-defense. He argues: "In this case, the defendant was confronted, while alone and at night, by a dangerous former drug dealer and potential gang member, in an enclosed space from which he was unable to easily escape. At trial, the defendant asserted that he cut [Holmes] in self-defense, as Holmes was the initial aggressor and was acting in a menacing manner." He contends that "the state's evidence did not disprove beyond a reasonable doubt that the defendant acted in self-defense." The state argues that it presented sufficient evidence to disprove the defendant's self-defense claim and to establish that the defendant was not justified in using deadly physical force against Holmes. We agree with the state.

"On appeal, the standard for reviewing sufficiency claims in conjunction with a justification offered by the defense is the same standard used when examining claims of insufficiency of the evidence. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . Moreover, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 778, 99 A.3d 1130 (2014), cert. denied,      U.S.     , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

"The rules governing the respective burdens borne by the defendant and the state on the justification of self-defense are grounded in the fact that [u]nder our Penal Code, self-defense, as defined in [General Statutes] § 53a-19 (a) . . . is a defense, rather than an affirmative defense. See General Statutes § 53a-16. Whereas an *affirmative defense* requires the defendant to establish his claim by a preponderance of the evidence, a properly raised *defense* places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. See General Statutes § 53a-12. Consequently, a defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a

reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Revels*, supra, 313 Conn. 778–79.

Under § 53a-19 (a), "a person is justified in using reasonable physical force upon another person to defend himself . . . from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose . . . ."

Under § 53a-19 (b), "a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he or she is in his or her dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor . . . ."

Under § 53a-19 (c), "a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

In order to determine whether the state produced sufficient evidence to disprove beyond a reasonable doubt the defendant's claim of self-defense, we first must set forth the defendant's theory of self-defense. The defendant's theory of self-defense was that he took reasonable steps to defend himself, given the threatening behavior of Holmes. The defendant relied on the following evidence. Holmes showed up at the restaurant, after hours, in violation of the employee handbook, with another person. Holmes had been drinking earlier that night.[6] Holmes asked the defendant to go outside, where he confronted him about allegations he had heard. The defendant denied the allegations and went back into the restaurant, calling his wife on the phone to tell her that he was having a problem and needed assistance. The defendant sounded very concerned. Holmes followed the defendant into the restaurant and was confronting him in a threatening manner. The defendant again tried to walk away. Holmes followed him and the two ended up face to face, with Holmes holding his keys in his hand, behaving aggressively. Feeling threatened, the defendant, using a razor blade that he used to clean the fryers at work, struck Holmes to protect himself from what he believed to be an imminent physical attack.[7]

We next consider the evidence produced by the state, viewed in a light consistent with the jury's verdict, to disprove the defendant's claim of self-defense. Holmes and the defendant had words outside the restaurant, where they resolved Holmes' issue with the defendant. The defendant returned to the inside of the restaurant and called his wife to tell her he was having a problem. When Holmes returned to the restaurant, the defendant did not go into the bathroom and lock the door. He did not call the police or 911. Instead, he moved around the restaurant, often with his back to Holmes, and then moved near the fryer. The defendant then repeatedly told Holmes that he was trying to save Holmes' life. Holmes was yelling at the defendant, tossing his keys from hand to hand, but he did not strike the defendant. The defendant, holding a razor blade that was used to clean the fryer, then reached out, grabbed Holmes by the neck or back of the head, pulled Holmes' head closer to him, and cut Holmes' throat with the razor blade. Holmes then fled the restaurant, bleeding from his neck. The defendant ran after him into the parking lot, chased Holmes around the car twice, and said, "see what happens when you mess with me."

Although the defendant, on appeal, concedes that the restaurant's video does not show Holmes striking the defendant, he argues that although "[i]t is possible the defendant's left hand circles Holmes' head first [as he cut Holmes' throat]; it is also possible, from the movements of the parties, that Holmes threw a left hook at the defendant's ribs before this happened." On appeal, we do not entertain possibilities inconsistent with the jury's verdict. Although the defendant argues that he was afraid of the larger, more muscular Holmes, who "possibly" hit him in the ribs, and that his fear justified his use of deadly force, the jury reasonable chose to credit the testimony of Holmes. Holmes testified that he did not strike the defendant, that he and the defendant were arguing, and that the defendant, then, reached out, grabbed him, and cut his throat. This testimony also was consistent with the video. Viewing the evidence in the light most favorable to sustaining the verdict, as we must, we conclude that the state produced evidence that was sufficient to disprove beyond a reasonable doubt the defendant's defense.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant filed a motion for a judgment of acquittal and a motion for a new trial, arguing that the jury's verdict was legally inconsistent because each charge requires a mutually exclusive state of mind. The court denied the motions.

[2] The defendant argues that the Supreme Court clarified in *Chyung* that the result of the crime is synonymous with "injury to the victim." See *State* v. *Chyung*, supra, 325 Conn. 246. According to the defendant, this means that because Holmes suffered only one injury from one act, both charges against the defendant related to the same result, and he, therefore, could not be convicted of both charges. The defendant essentially is arguing that *Chyung* overruled *Nash* regarding the meaning of "the same result."

Although we acknowledge that our Supreme Court stated in *Chyung* that "a defendant cannot simultaneously [act] intentionally and recklessly with regard to the same act and the same result, i.e., the injury to the victim"; (internal quotation marks omitted) id.; the defendant has taken this one sentence out of context. The statement is a quote from the court's earlier decision in *State* v. *King*, supra, 216 Conn. 593. In *Nash*, the court thoroughly discussed and distinguished *King*. See *State* v. *Nash*, supra, 316 Conn. 658–66. The court, in *Nash*, then concluded that even though the charges under § 53a-59 (a) (1) and (a) (3) related to the same injury to the same victim, they did not relate to the same result and were not legally inconsistent because the charges involved different mens rea that were not inconsistent with each other. Id., 668–69. Given this history, we are unpersuaded that in 2017 the Supreme Court in *Chyung* intended effectively to overrule, sub silentio, *Nash*, a decision issued just two years earlier, merely by quoting a 1999 decision that it went to great lengths to distinguish in *Nash*.

[3] In *Nash*, our Supreme Court also carefully explained: "We emphasize that our conclusion that the defendant's convictions of intentional and reckless assault in the first degree were not mutually exclusive does not mean that a defendant lawfully may be punished for both offenses. . . . [T]he trial court in the present case merged the two assault convictions for purposes of sentencing and sentenced the defendant only on his intentional assault conviction. The defendant has not claimed that this approach violates his right against double jeopardy." (Citation omitted.) *State* v. *Nash*, supra, 316 Conn. 669–70 n.19.

[4] The defendant also offered the statement as a statement against penal interest and as a statement of his then-existing mental or emotional condition. He concedes that neither claim is viable under existing Supreme Court precedent; he stated in his appellate brief that he raised these grounds on appeal only for the sake of "future review." Accordingly, they need not be addressed.

[5] The defendant contends that the court's exclusion of his statement to the police denied him the constitutional right to present a defense. We disagree. See *State* v. *Kelly*, 256 Conn. 23, 59 n.19, 770 A.2d 908 (2001) (disagreeing with claim that exclusion of defendant's statement to father raises constitutional question, and concluding, instead, that claim was evidentiary in nature, subject to review under abuse of discretion standard). "Evidentiary matters are generally not constitutional in nature and will be overturned only upon a showing of abuse of discretion." Id.

[6] Holmes testified that he drank three Heinekens at approximately 9 or 10 p.m. that evening. His medical records from Hartford Hospital showed the presence of alcohol in his blood, but Dr. Bogner could not testify with confidence regarding a level of intoxication because he was not aware of whether Hartford Hospital used the same conversion tables as Day Kimball Hospital. Dr. Bogner did state, however, that if both hospitals used the same conversion tables, that Holmes' blood alcohol level would have been 0.064 percent, which is less than the legal limit of 0.08 percent. The records also showed the presence of opiates in Holmes' bloodstream, but Dr. Bogner testified that this may have been due to the administration of morphine while he was at Day Kimball Hospital.

[7] In his 911 call after the incident, which was admitted into evidence, the defendant reported that Holmes had threatened his life, and that he cut Holmes with a razor while defending himself.